UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

ANDREW GISSENDANNER,

                Plaintiff,

      v.

GENERAL MOTORS CORPORATION and
GENERAL MOTORS COMPONENTS
HOLDINGS, LLC,

                Defendants.

_____

**DECISION AND ORDER**

6:20-CV-06109 EAW

## <u>INTRODUCTION</u>

Plaintiff Andrew Gissendanner ("Plaintiff") alleges discrimination based on race and color in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Dkt. 1). Currently pending before the Court is a motion for summary judgment filed by defendant General Motors Components Holdings, LLC ("Defendant").[1] (Dkt. 37). For the reasons that follow, Defendant's motion is granted.

---

[1] Plaintiff has also named General Motors Corporation as a defendant in this matter. However, Defendant has presented uncontroverted proof that Plaintiff was employed by General Motors Components Holdings, LLC. (*See, e.g.,* Dkt. 37-4 at ¶¶ 1-2). There is nothing in the record to support the conclusion that General Motors Corporation was ever Plaintiff's employer, and so the Court agrees with Defendant that Plaintiff's claims against that entity must fail. *See Mira v. Kingston*, 218 F. Supp. 3d 229, 235 (S.D.N.Y. 2016) ("[T]he only proper defendant in a Title VII claim is the plaintiff's employer[.]"), *aff'd*, 715 F. App'x 28 (2d Cir. 2017).

**BACKGROUND**

I.    **Factual Background**

As a threshold matter, the Court notes that Defendant, in compliance with Local Rule of Civil Procedure 56(a)(1), included with its motion for summary judgment "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which [it] contends there is no genuine issue to be tried." (*See* Dkt. 37-2 ("Defendant's Rule 56 Statement")). Plaintiff did not file any response to Defendant's motion for summary judgment, including failing to file "a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs[.]" L. R. Civ. P. 56(a)(2). It is accordingly within the Court's discretion to deem the facts set forth in Defendant's Rule 56 Statement "admitted for purposes of" the instant motion. *Id.*; *see also Suares v. Cityscape Tours, Inc.*, 603 F. App'x 16, 18 (2d Cir. 2015). The Court has done so where those facts are supported by the record. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs. Inc.*, 426 F.3d 640, 648 (2d Cir. 2005).

Defendant hired Plaintiff on or about September 9, 2013, as a production assembly worker at its production facility in Rochester, New York. (Dkt. 37-2 at ¶¶ 1-2). In or around February of 2015, Plaintiff became a screw machine operator. (*Id.* at ¶ 4). Defendant downsized some of its operations in or around January of 2022. (*Id.* at ¶ 5). At that time, Plaintiff was returned to the assembly department. (*Id.*).

Plaintiff has performed work in a variety of departments during his tenure with Defendant.  (*Id*. at ¶ 7).  His pay at the time of hire was $15.78 per hour.  (*Id*. at ¶ 9).  He has received regular pay increases throughout his employment, and his pay was not decreased when he complained about discrimination, nor was it decreased when he was returned to the assembly department in January of 2022.  (*Id*. at ¶ 10).  Plaintiff now earns $22.50 per hour.  (*Id*. at ¶ 12).  He never applied for any jobs outside the screw machine department while he was stationed there, nor were there any promotions available within that department.  (*Id*. at ¶ 11).

 Plaintiff is a member of the United Auto Workers ("UAW"), Local 197, and is accordingly subject to the terms and conditions of a collective bargaining agreement ("CBA") between UAW and Defendant.  (*Id*. at ¶ 16).  Certain benefits available to employees under the CBA are dependent on seniority dates; Plaintiff's seniority date is September 9, 2013.  (*Id*. at ¶ 17).

Defendant's employee handbook contains an "equal opportunity employment" policy.  (*Id*. at ¶ 20).  Employees may make complaints about alleged violations of the policy, including by use of a hotline known as "Awareline."  (*Id*.).  When Defendant receives a complaint through Awareline, it assigns an independent investigator to meet with the complainant and to conduct an investigation to determine whether complainant's allegations can be substantiated.  (*Id*. at ¶ 21).  UAW members are entitled to have a union

representative present whenever speaking to Defendant's labor relations department or an independent investigator regarding a complaint.  (*Id*. at ¶ 22).

Plaintiff works eight hours per day, Monday through Friday, with occasional overtime on Saturdays.  (*Id*. at ¶ 19).  He currently works the second shift, which runs from 3:18 p.m. to 11:48 p.m.  (*Id*. at ¶ 18).

In the screw machine department, Defendant operates different machines that grind metal into automotive fasteners and parts: pintle machines; guide ring machines; collar machines; pull piece machines; weld ring machines; and hydromat machines.  (*Id*. at ¶ 14).  As a screw machine operator, Plaintiff was responsible for operating pintle machines, guide ring machines, and collar machines.  (*Id*. at ¶ 15).  Prior to becoming a screw machine operator in February of 2015, Plaintiff had no prior experience operating these machines.  (*Id*. at ¶ 23).  Plaintiff considers operating pintle machines, guide ring machines, and collar machines to be undesirable "grunt work," and views operating pull piece machines, weld ring machines, and hydromat machines as less labor intensive and thus more desirable.  (*Id*. at ¶¶ 29-30).  However, Plaintiff conceded at his deposition that he is only assuming that these jobs are easier and that he has no experience operating pull piece machines, weld ring machines, or hydromat machines.  (*Id*. at ¶¶ 31-32).  There is no difference in rate of pay for running pintle machines, guide ring machines, and collar machines as opposed to the other machines that Plaintiff views as more desirable.  (*Id*. at ¶ 35).

Plaintiff identifies as Black. (Dkt. 1 at 4).[2] He acknowledged at his deposition that Black employees, including Omar James, Tommy Shaw, Shawn Quinn, John Trott, and Andre Walker operated pull piece machines, weld ring machines, and hydromat machines during the relevant time period. (Dkt. 37-2 at ¶ 33). Of these individuals, Omar James, Tommy Shaw, Shawn Quinn, and Andre Walker all had more seniority than Plaintiff. (*Id.* at ¶ 34).

Plaintiff received occasional discipline during the course of his employment. On February 16, 2016, he received written discipline for being tardy to work. (*Id.* at ¶ 36). On March 8, 2016, he received written discipline and a disciplinary layoff for leaving his department without permission during work hours. (*Id.* at ¶ 37). On November 2, 2016, he received written discipline for being tardy to work. (*Id.* at ¶ 38).

On February 21, 2017, Plaintiff received written discipline for failing to perform necessary checks as a screw machine operator, resulting in the production of 3,000 pieces of material that had to be scrapped. (*Id.* at ¶ 39). Plaintiff filed a grievance in connection with this discipline, but UAW either did not process it or found it to lack merit. (*Id.* at ¶ 40).

---

[2]     The complaint states that Plaintiff is African American. (*See* Dkt. 1 at 4). However, at his deposition he was asked, "when you refer to your race, do you refer to your race as black? African American? Something else?" and he answered "Black." (Dkt. 37-3 at 60). The Court has accordingly used Plaintiff's preferred nomenclature for his racial identity.

Plaintiff claims that in 2017, Caucasian supervisor Mike Lockwood ("Lockwood") threw out Plaintiff's extra portable locker containing his diabetic supplies. (*Id*. at ¶ 41). It is undisputed that Lockwood removed a Caucasian employee's locker at the same time he removed Plaintiff's locker, because there was a rule that each employee could have only one locker. (*Id*.). When Defendant was made aware that Plaintiff's extra locker contained personal items, Defendant reimbursed Plaintiff for the replacement costs. (*Id*.).

Plaintiff has alleged that supervisor Andy Ashline ("Ashline") singled him out and harassed him about making bad parts. (*Id*. at ¶ 42). There is no evidence that Plaintiff ever complained to Defendant about Ashline's conduct. (*Id*.). Further, it is a regular practice for Defendant to issue discipline when parts have to be scrapped. (*Id*.).

On October 9, 2017, Plaintiff received written discipline for careless workmanship and unnecessarily making parts. (*Id*. at ¶ 43). On October 10, 2017, Plaintiff submitted a complaint via Awareline alleging that he was being falsely accused of breaking machines in the screw machine department and that he was being unfairly required to operate three machines. (*Id*. at ¶ 44). On October 11, 2017, Tracy Gilmore of Defendant's office of labor relations issued a memorandum to Plaintiff explaining the basis for the discipline and further stating that Defendant's quality engineer had checked the parts from Plaintiff's machine and had been unable to find a single useable part (equating to approximately 5,100 bad parts). (*Id*. at ¶ 45). Plaintiff filed a grievance related to this discipline, but it is unclear from the record how that grievance was resolved. (*Id*. at ¶ 46).

On December 12, 2017, Plaintiff called Awareline and complained that group leader John McCoy ("McCoy") was requiring him to operate three machines while other employees were only required to operate one. (*Id*. at ¶ 47). At his deposition, Plaintiff specifically identified John Finner, Tania Newbould, and Jack Salami as employees who were only required to run a single machine. (*Id*. at ¶ 48). However, Plaintiff subsequently conceded that Jack Salami and Tania Newbould would run two collar machines at one time, while Plaintiff was operating guide ring and pintle machines. (*Id*. at ¶¶ 49-50).

In Defendant's screw machine department, supervisors determine work assignments based on utilization. (*Id*. at ¶ 51). More specifically, each machine has been assessed to determine the amount of time per shift that it requires hands-on work from an operator. (*Id*.). Supervisors aim to achieve 90% utilization per employee per shift, which means that the number of machines an employee is required to operate is a function of how much hands-on time those particular machines require. (*Id*.). The ultimate goal is to equalize the amount of hands-on work that each employee performs per shift. (*Id*.). The types of machines that Plaintiff regularly operated required less hands-on work per shift than other kinds of machines. (*Id*. at ¶ 52).

On July 9, 2018, Plaintiff received written discipline for being tardy to work. (*Id*. at ¶ 53). On August 18, 2018, Plaintiff called Awareline and alleged that he was being subjected to a "hostile work environment." (*Id*. at ¶ 54). Plaintiff alleged that employees in the screw machine department said he did have enough experience to work there and

that he was incompetent.  (*Id*.).  Defendant investigated this complaint in accordance with its policies.  (*Id*. at ¶ 56).  While being interviewed about this complaint, Plaintiff stated that he did not actually hear any of his co-workers saying that he did not have enough experience, but that he felt that his co-workers perceived him as not having enough experience.  (*Id*. at ¶ 57).

On September 12, 2018, Plaintiff called Awareline and complained that group leaders Donald Graham and McCoy had improperly denied him training.  (*Id*. at ¶ 58).  He also renewed his complaints about having to work on multiple machines.  (*Id*.).  Defendant investigated this complaint, and concluded that Plaintiff was "in line with the rest of the department in terms of the number of jobs each employee is trained on, commensurate with experience."  (*Id*. at ¶¶ 58-60).  Nevertheless, Plaintiff was offered an opportunity to train on overtime on a two-machine battery or "to train with a subject matter expert on his shift on a part number that could assist him with rotating more frequently."  (*Id*. at ¶ 62).  He declined this training.  (*Id*.; *see also* Dkt. 37-3 at 1275).  Defendant considered the situation resolved.  (*Id*. at ¶ 63).

On February 12, 2019, Plaintiff submitted a complaint in which he alleged that Black employees were not being permitted to run the hydromat machines.  (*Id*. at ¶ 64).  However, Plaintiff acknowledged at his deposition that Black employee Tommy Shaw, who had more seniority than Plaintiff, operated the hydromat machines.  (*Id*. at ¶ 65).

On August 23, 2019, Plaintiff submitted a complaint via the Awareline system in which he alleged that Black employees were doing "slave work" when compared to Caucasian employees because they were required to run three machines. (*Id*. at ¶ 67). At his deposition, Plaintiff acknowledged that Caucasian employees in the screw machine department, including Ann Fox and Jack Salami, were also required to run three machines at times. (*Id*. at ¶ 68). Plaintiff submitted similar complaints on July 28, 2020, and October 14, 2020, and further claimed that his seniority had been "violated" on nine occasions. (*Id*. at ¶ 69). These complaints were investigated and determined to be unsubstantiated. (*Id*.).

On January 1, 2020, Plaintiff received a positive evaluation indicating that he demonstrated quality work consistently and without coaching in all categories but one. (*Id*. at ¶ 71). On November 13, 2020, Plaintiff received written discipline for being tardy to work. (*Id*. at ¶ 70).

In or around March of 2021, Plaintiff submitted a complaint to Awareline making allegations substantially similar to his previous complaints. (*Id*. at ¶ 73). Defendant investigated the complaints and determined that they were unsubstantiated. (*Id*. at ¶ 74).

## II.   **Procedural Background**

Plaintiff commenced the instant action on February 18, 2020. (Dkt. 1). Defendant filed its answer on November 11, 2020. (Dkt. 19). Discovery closed on May 6, 2022. (Dkt. 33).

Defendant filed the instant motion for summary judgment on July 6, 2022.  (Dkt. 37).  The Court entered a scheduling order pursuant to which Plaintiff's response was due by August 4, 2022.  (Dkt. 38).  Plaintiff did not file a response to Defendant's motion for summary judgment.

## DISCUSSION

### I.  Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the Court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

"The moving party bears the burden of showing the absence of a genuine dispute as to any material fact. . . ."  *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014).  "Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial."  *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Once the

moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts[] and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).   Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358.   Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II.   **Plaintiff's Claims**

In his complaint, Plaintiff alleged that he was complaining of: (1) failure to promote; (2) unequal terms and conditions of employment; and (3) retaliation.   (Dkt. 1 at 4).   The Court considers each of these claims below.

### A.   **Failure to Promote**

As to Plaintiff's failure to promote claim, the record is devoid of any evidence that Plaintiff ever applied for or was denied a promotion by Defendant.   Accordingly, summary judgment on this claim is warranted.   *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (a plaintiff claiming discriminatory failure to promote must demonstrate,

among other things, that he "applied and was qualified for a job for which the employer

was seeking applicants" and was rejected for the position. (citation omitted)).

###    B.    Unequal Terms and Conditions of Employment

On a motion for summary judgment, discrimination claims under Title VII are

evaluated under the burden-shifting analysis described in *McDonnell Douglas v. Green*,

411 U.S. 792 (1973).  Plaintiff must initially establish a *prima facie* case of discrimination

by establishing that: (1) he was within the protected class; (2) he was qualified for the

position; (3) he was subject to an adverse employment action; and (4) the adverse action

occurred under circumstances giving rise to an inference of discrimination.  *See Terry v.*

*Ashcroft*, 336 F.3d 128, 137-38 (2d Cir. 2003); *Sotomayor v. City of New York*, 862 F.

Supp. 2d 226, 253 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  If a plaintiff

establishes a *prima facie* case, the burden then shifts to the employer to articulate "some

legitimate nondiscriminatory reason" for the disparate treatment.  *McDonnell Douglas*, 411

U.S. at 802.  If the employer articulates a sufficient reason, the burden shifts back to the

plaintiff to prove that the employer's reason "was in fact pretext" for discrimination.  *Id.*

at 804; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).

Here, Plaintiff's complaint identified the following ways in which he had allegedly

been discriminated against: he was required to work on undesirable machines and/or to

operate more machines than other employees; he was not trained on other machines; and

he was unfairly disciplined.   The Court agrees with Defendant that Plaintiff cannot demonstrate a *prima facie* case of discrimination as to any of these alleged adverse actions.

Turning first to the matter of machine assignments, Plaintiff cannot demonstrate that being assigned to work on particular machines constituted an adverse employment action. When assessing a Title VII discrimination claim, an adverse employment action is defined as one that causes a "materially adverse change in the terms and conditions of employment," rising above the level of a "mere inconvenience or an alteration of job responsibilities." *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 478 (2d Cir. 2009) (quoting *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)).   "[E]veryday workplace grievances, disappointments, and setbacks" are not adverse employment actions for purposes of a Title VII discrimination claim. *Cunningham v. N.Y. State Dep't of Labor*, 326 F. App'x 617, 619 (2d Cir. 2009).

Here, there is no evidence—apart from Plaintiff's subjective assessment—to support the claim that working on pintle machines, guide ring machines, and collar machines was undesirable "grunt work."   While Plaintiff may have believed  that other machine assignments were more desirable, "[i]t is well-established that subjective dissatisfaction with assignments does not constitute adverse employment action." *Harrison v. New York City Off-Track Betting Corp.*, No. 99 CIV. 6075 (VM), 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); *see also Mitchell v. Metro. Transit Auth. Cap. Constr. Corp.*, No. 16 CIV. 3534 (KPF), 2018 WL 3442895, at *12 (S.D.N.Y. July 17,

2018) (finding no adverse employment action where the plaintiff claimed to have been switched to a less desirable project). Nothing in the record before the Court would permit a rational juror to conclude that being required to operate particular machines within the screw machine department constituted an adverse employment action.

Similarly, Plaintiff cannot substantiate his claim that being required to run three machines constituted an adverse employment action. The undisputed evidence before the Court is that the number of machines an employee is assigned is a function of the hands-on time required, and that running three machines with lower hands-on requirements is not more onerous than running one or two machines that require more significant hands-on time. Again, Plaintiff's subjective belief that being required to run three machines was more onerous is insufficient to demonstrate a genuine factual dispute.

Further, there are no circumstances giving rise to an inference of discrimination with respect to the challenged machine assignments.

> Inference of discrimination is a flexible standard that can be satisfied differently in differing factual scenarios. . . . An inference of discrimination can be drawn from circumstances such as the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's adverse employment action, or by showing that an employer treated an employee less favorably than a similarly situated employee outside his protected group.

*Brown v. Xerox Corp.*, 170 F. Supp. 3d 518, 532 (W.D.N.Y. 2016) (quotation and original alterations omitted). None of these circumstances are present here. As detailed above,

- 14 -

other Black employees were assigned to the machines that Plaintiff identifies as more desirable.  Further, there were Caucasian employees who were required to run three machines at a time.  Plaintiff does not claim that any derogatory comments were made regarding his race or color, and has not come forward with any other evidence from which a rational juror could infer discriminatory conduct.  The mere fact that Plaintiff and his supervisors were of different races does not, by itself, support an inference of discrimination.  *See, e.g.*, *Johnson v. City of N.Y.*, 669 F. Supp. 2d 444, 450 (S.D.N.Y. 2009) (citing *Yusuf v. Vassar Coll.*, 35 F.3d 709, 71 (2d Cir. 1994)); *Holdmeyer v. Veneman*, 321 F. Supp. 2d 374, 382 (D. Conn. 2004), *aff'd sub nom. Holdmeyer v. Dep't of Agric.*, 146 F. App'x 535 (2d Cir. 2005).

As to Plaintiff's claim that he was not trained on other machines, inadequate training may constitute an adverse employment action, "but only in circumstances where an employer denies necessary job training to an employee and the terms and conditions of his employment are thereby harmed."  *Carpenter v. City of Mount Vernon*, 198 F. Supp. 3d 272, 279-80 (S.D.N.Y. 2016).  Claims of a denial of training that are "vague and unsupported" are insufficient to defeat a motion for summary judgment. *Rodriguez v. Long Island Am. Water, Inc.*, No. 12-cv-2970(JFB)(ARL), 2014 WL 4805021, at *14 (E.D.N.Y. Sept. 26, 2014).  Moreover, "[w]hen an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there

is no adverse employment action." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006).

Here, Plaintiff has not come forward with any evidence to support his claim that he was denied necessary training.   To the contrary, Defendant has submitted unrebutted evidence that Plaintiff's training was commensurate with his experience and in line with the rest of his department.   Further, Defendant offered Plaintiff additional training, which he declined.  On these facts, no rational juror could find an adverse employment action.

There is also not evidence that any failure to train Plaintiff occurred under circumstances giving rise to an inference of discrimination.   Plaintiff has not come forward with evidence that any similarly situated employee of a different race or color was offered training opportunities that he was not, or with any other evidence from which a rational juror could conclude that Plaintiff was denied training opportunities based on his membership in a protected class.

Turning to Plaintiff's claim that he was unfairly disciplined based on his race and color, it is important to note that to rise to the level of an adverse action in the discrimination context, the discipline must impact the terms and conditions of employment:

> Verbal and written warnings generally do not constitute adverse employment actions unless they lead to more substantial employment actions that are adverse.   [C]ourts in this circuit have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation [and] . . . criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action.

- 16 -

*Santiago v. Sodexo, Inc.*, No. 3:21-CV-534(AWT), 2022 WL 267529, at *3 (D. Conn. Jan. 26, 2022) (citations omitted).  Here, there is no support in the record that the terms and conditions of Plaintiff's employment were impacted in any way by the written discipline in this case.  Accordingly, for the vast majority of the disciplinary instances at issue, Plaintiff cannot demonstrate an adverse employment action.

The removal of Plaintiff's extra locker also does not constitute an adverse employment action.  The undisputed evidence of record is that Defendant had a rule under which employees were only permitted one locker.  Enforcement of company policy is not an adverse employment action, so long as it is not done in a selective manner.  *See Salvana v. New York State Dep't of Corr. & Cmty. Supervision*, No. 521CV00735BKSML, 2022 WL 3226348, at *12 (N.D.N.Y. Aug. 10, 2022) ("[E]nforcement of the [employer's] policy does not constitute an adverse employment action, given that there are no allegations that the policy was selectively enforced against Plaintiff.").  Here, Plaintiff has not come forward with any evidence to support the conclusion that the one-locker rule was selectively enforced against him.  To the contrary, the undisputed evidence shows that another employee of a different race also had an extra locker removed at the same time as Plaintiff.

The record does demonstrate that on one occasion in 2016, the written discipline was accompanied by a disciplinary lay off, which is an adverse employment action.  However, Plaintiff cannot demonstrate that he was ever disciplined under circumstances

- 17 -

giving rise to an inference of discrimination.  The majority of the discipline he received was for being tardy, and there is no evidence before the Court that Plaintiff was not tardy on the occasions on which he was disciplined, or that employees of a different race or color were not disciplined for being tardy.  Similarly, as to being disciplined for having left his department during work hours, Plaintiff again has not come forward at the summary judgment stage with any evidence that this discipline was based on a false premise, or that employees outside of his race were treated differently.

A rational juror also could not conclude that Plaintiff was discriminatorily disciplined for having made parts that had to be scrapped.  The undisputed evidence of record shows that it was standard practice for employees of all races to receive this type of discipline.  While Plaintiff may have felt mistreated by Ashline, there is nothing in the record before the Court to support the conclusion that Ashline's conduct was motivated by Plaintiff's race or color.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) ("Title VII . . . does not set forth a general civility code for the American workplace" and does not protect against personality conflicts (quotation omitted)).

As to Plaintiff's complaint regarding the removal of his personal locker, again, there is nothing in the record to support the conclusion that this action was motivated by discriminatory animus.  It is undisputed that a Caucasian employee's extra locker was removed at the same time.  Further, Plaintiff was reimbursed for the personal items he claims were in the discarded locker.

- 18 -

The Court notes finally that Plaintiff's January 2022 return to the assembly department post-dates the filing of the complaint and is accordingly not asserted therein as a potential adverse employment action.   Plaintiff also has not argued in opposition to Defendant's motion for summary judgment that this transfer constituted an adverse employment decision.   Nonetheless, for the sake of completeness, the Court has considered whether this transfer could constitute an adverse employment action and concludes that, on the instant record, it could not.   There is nothing in the record before the Court suggesting that the assembly department is a less desirable assignment, and it is undisputed that Plaintiff's pay was not decreased as a result of the transfer.   *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (a transfer is not an adverse employment action if it is "truly lateral and involves no significant changes in an employee's conditions of employment").

In sum, Plaintiff cannot demonstrate a *prima facie* case of discrimination under Title VII, because he cannot show that he suffered an adverse employment action under circumstances giving rise to an inference of discrimination.   Accordingly, Defendant is entitled to summary judgment at the first step of the *McDonnell Douglas* analysis.

## C.   Retaliation

The Court turns finally to Plaintiff's retaliation claim.   Title VII contains an anti-retaliation provision that makes it unlawful "'for an employer to discriminate against any . . . employee[] or applicant[] . . . because [that individual] opposed any practice' made

unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII investigation or proceeding." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (alterations in original) (quoting 42 U.S.C. § 2000e-2(a)). Retaliation claims are evaluated pursuant to a three-step burden-shifting analysis. *Id.* First, the plaintiff must establish a *prima facie* case by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.*

If the plaintiff sustains his initial burden, a presumption of retaliation arises and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (quotation omitted). If the defendant can do so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* (quotation omitted). "A plaintiff can sustain [that] burden by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause[.]" *Id.* (quotation omitted).

Actions are "materially adverse" for purposes of a retaliation claim if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 165 (quoting *Burlington*, 548 U.S. at 57). The Second Circuit has held that "petty slights or minor annoyances" are not materially adverse for purposes of a Title VII retaliation claim. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24-25 (2d Cir. 2014). When deciding a summary judgment

motion as to a Title VII retaliation claim, in addition to considering alleged acts of retaliation on their own, courts must consider them in the aggregate, "as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 225 (E.D.N.Y. 2014) (quoting *Hicks*, 593 F.3d at 165).

Applying the less stringent standard applicable to retaliation claims, the Court finds that the written discipline to which Plaintiff was subject—in addition to the disciplinary layoff in 2016—could constitute an adverse employment action. However, the Court does not find that Plaintiff's workload (that is, his machine assignments or the number of machines he was required to operate) constitutes an adverse employment action, even for purposes of his retaliation claim. As discussed above, the evidence of record would not permit a rational juror to conclude that operating any particular machine within the screw machine was an objectively less desirable job responsibility. *See Burlington*, 448 U.S. at 68-69 (standard for material adversity is objective and does not take into account "a plaintiff's unusual subjective feelings"). The same is true of operating three machines. And, as discussed above, there is no evidence in the record that Plaintiff was ever denied any training opportunities, or that the one-locker policy was selectively applied to him. A reasonable worker would not be dissuaded from making or supporting a charge of

discrimination because he was given the same training as others in his department or because he was required to follow the same company policies as other employees.[3]

As to the disciplinary layoff and the written discipline, Plaintiff cannot demonstrate a causal connection between his protected activity and any adverse employment action. The disciplinary layoff occurred in 2016, before Plaintiff made any complaints. *See Frantti v. New York,* 850 F. App'x 17, 21 (2d Cir. 2021) ("the causal connection needed for a proof of retaliation claim requires showing that the protected activity was *followed in time* by the adverse action" (quotations and alteration omitted and emphasis in original)).

With respect to the written discipline, the unrebutted evidence of record demonstrates that Plaintiff was treated the same—that is, he was issued written discipline when tardy and when he produced parts that needed to be scrapped—both before and after he engaged in his protected conduct. *See id.* (affirming grant of summary judgment on retaliation claim because "[a]s the District Court correctly observed, [the plaintiff's] employer applied the same absence and tardiness policies to him before and after his 2015 complaints"). There is no evidence in the record before the Court from which a rational

---

[3]    As to the January 2022 return to the assembly department, this is again not raised in the complaint as a theory of retaliation, and the record does not support a conclusion that it impacted Plaintiff's conditions of employment in any meaningful way.  Moreover, it occurred 10 months after Plaintiff's March 2021 complaint, and there are no other circumstances that would support inferring a causal connection.  *See Nicastro v. New York City Dep't of Design & Const.,* 125 F. App'x 357, 358 (2d Cir. 2005) (no causal connection because the plaintiff's "demotion and salary reduction occurred almost ten months after" his protected activity).

juror could find a causal connection between the written discipline and the protected activity.

For all these reasons, no rational juror could find that Defendant retaliated against Plaintiff and Defendant is accordingly entitled to summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. 37) is granted in its entirety. The Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated:      November 28, 2022
             Rochester, New York